UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SANDRA GIVENS, *et al.*,               :      Case No. 1:10-cv-382
                                       :
          Plaintiffs,                  :      Judge Timothy S. Black
                                       :
vs.                                    :
                                       :
PAUL F. WENKER, *et al.*,              :
                                       :
          Defendants.                  :

**ORDER THAT: (1) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Doc. 50) IS GRANTED; AND (2) THIS CASE IS CLOSED**

        This civil action is before the Court on Defendants' motion for summary judgment

(Doc. 50) and the parties' responsive memoranda (Docs. 53, 54).

**I.     BACKGROUND FACTS AND PROCEDURAL POSTURE**

        Plaintiffs[1] filed this civil action against Paul Wenker[2] and the law firm of Rendigs,

Fry, Kiely & Dennis, alleging that Defendants deprived them of companionship with

Harold Waller[3] based upon their race, and have engaged in a scheme to control his assets.

---

        [1] Plaintiffs include Sandra Givens, Tanya Green, and Elizabeth Robinson. Ms. Givens is
Mr. Harold Waller's niece, who unsuccessfully applied to the Hamilton County Probate Court to
be his guardian. Ms. Green is Mr. Waller's niece, who was evicted from an apartment owned by
Mr. Waller pursuant to a notice to leave the premises dated October 31, 2008. Ms. Robinson was
the medical receptionist for the Ideal Medical Building, owned by Mr. Waller from 1990 until
she was terminated on October 31, 2008.

        [2] Mr. Wenker is a partner with Rendigs Fry Kiely & Dennis, who has provided legal
services to Mr. Waller since 1976.

        [3] Mr. Waller is an 81 year-old African American man. He is a former pharmacist and
businessman.

Plaintiffs allege claims for: (1) racial discrimination pursuant to 42 U.S.C. § 1981 (Counts I, II); (2) racial discrimination pursuant to the Fair Housing Act (Count III); (3) legal malpractice (Count IV); (4) unlawful discrimination under state law (Ohio Rev. Code § 4112.02(A)) (Count V); and (5) abuse of process (Count VI). Defendants move for summary judgment on each claim.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter fo law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of showing, by identifying specific evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," that there exists no genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the movant meets its burden, it is then the opposing party's duty to "set forth specific facts showing there is a genuine [dispute] for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(a).

The requirement that the dispute be "genuine" is emphasized. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. Therefore, "[t]he mere existence of a scintilla of evidence

in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 252. Furthermore, the non-moving party may not merely rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

"Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007). A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### III.    STATEMENT OF FACTS[4]

Paul Wenker has represented Harold Waller in personal and professional matters since approximately 1976. (Doc. 45 at 5). Mr. Waller appointed Mr. Wenker his

---

[4] In support of their memorandum in opposition, Plaintiffs attached affidavits "summarizing plaintiffs' deposition testimony." (Doc. 53 at 3). "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Depositions are "one of the best forms of evidence for supporting or opposing a summary-judgment motion," and affidavits, not being subject to cross-examination, "are likely to be scrutinized carefully by the court to evaluate their probative value." Wright, Federal Practice and Procedure, § 2722 at 373, 379 (3d ed. 1998). Plaintiffs' affidavits and the exhibits attached thereto contain argument, speculation, restatement of allegations in the Amended Complaint, hearsay, and statements not based on affiants' personal knowledge, in contravention of Rule 56(c). To the extent Plaintiffs believe their testimony was taken out of context, the remedy is to cite additional testimony from the deposition and add argument of counsel, not to file affidavits with contradictory testimony. Accordingly, the Court disregards these affidavits in reciting the facts.

attorney-in-fact[5] for all purposes beginning in 1989 and continuing to the present. (Doc. 45, Ex. 3; Doc. 50, Ex. 1 at 16, ¶¶ 4, 5). At his guardianship hearing, Mr. Waller testified that he has a very high regard for Mr. Wenker. (Doc. 50, Ex. 1 at 23; *Id.*, guardianship trans. at 77). Mr. Wenker acted on Waller's wishes and advised him on the best methods for accomplishing his business and financial goals. (Doc. 45 at 5).

Mr. Waller never married or had children (Doc. 50, guardianship trans. at 162), and he did not attend functions with his extended family (Doc. 28 at 8). Following the death of Waller's mother, he had little contact with other family members, except when Ms. Givens visited him at his pharmacy or he saw Ms. Green at his apartment building. (*Id.* at 9). In late October 2008, Mr. Waller was upset when Plaintiffs began checking up on him both at his and Ms. Felton's[6] apartments. (*Id.* at 14-15, 25-33).

Beginning in early 2008, while still acting as medical receptionist for Mr. Waller at the Ideal Medical Building ("Ideal"), Elizabeth Robinson suspected that Wenker, Chiaro,[7] and Felton were improperly influencing Waller to sign papers and make decisions that were not in Waller's best interest. (Doc. 47 at 66-67). Ms. Robinson looked up Mr.

---

[5] An attorney-in-fact is someone specifically named by another through a written "power of attorney" to account for that person in the conduct of the appointer's business. *Metro. Life Ins. v. Schneider-Viers*, No. 3:09cv497, 2010 U.S. Dist. LEXIS 77573, at *6 (S.D. Ohio July 2, 2010).

[6] Sharon Felton was Mr. Waller's girlfriend for many years.

[7] Cynthia Chiaro was an attorney with Rendigs, who worked closely with Mr. Wenker on behalf of Mr. Waller at all times relevant to the claims in this case.

Waller's properties in June 2008, saw they had been transferred to Limited Liability Corporations ("LLCs"), and was concerned because Waller's name was not on the properties. (*Id*. at 142). Ms. Robinson raised this issue with Givens and Green in mid-2008, and all three formed the suspicion that Wenker was stealing Waller's property or cheating him in some way. (Doc. 46 at 72, 92; Doc. 28 at 129; Doc. 27 at 152-54).

On October 1, 2008, Ms. Robinson, Jim Williams (Waller's friend), and Mr. Waller met with attorney Gary Franke to seek to determine whether Mr. Wenker was properly handling Waller's business affairs. (Doc. 47 at 183). Mr. Franke requested and reviewed all relevant documents, met with Waller several times, and met with Wenker and Waller on October 30, 2008. (Doc. 45 at 19-20, 42-43, Ex. Q). Mr. Franke found no evidence of improper conduct and informed Waller that everything appeared to have been handled appropriately. (Doc. 50, Ex. 1 at 3, ¶ 6).

On the morning of October 30, 2008, Plaintiffs became concerned when they learned Mr. Waller had lost his keys. (Doc. 48 at 25-33). Plaintiffs called Mr. Waller, but he told them to stay out of his business. (*Id*.) Plaintiffs went to Waller's apartment, but he would not let them in. (*Id*.) Ms. Green called the police, who responded to the scene, but found no problem after speaking with Waller. (*Id*.) Soon after the police met with Waller, he came outside "hollering and he was telling my sister and Liz and Tanya (*sic*) to stay away from him, to get off his property, that his money was his, and he was okay, and that we just needed to leave." (*Id*.) Instead of leaving, all three Plaintiffs

followed Waller from his apartment to Ideal, where Mr. Waller was meeting a locksmith to change the locks. They continued to follow him downtown to his 1:00 p.m. appointment with Mr. Franke, where they sat in the waiting room while Franke spoke with Waller. (*Id*. at 19; Doc. 46 at 43-49).

Next, Plaintiffs followed Franke and Waller to their meeting with Wenker at Rendigs, where they again sat in the waiting room. Ms. Green testified that they followed Waller because they planned to take him to a medical appointment at 5:00 p.m. However, Waller left Rendigs with Felton without notifying Plaintiffs. (*Id*.; Doc. 50, Ex. 1 at 16, ¶ 19). Once they realized Waller had left, Plaintiffs drove to Klinge Locksmith in Walnut Hills to pick up the new keys to Ideal, because they had seen Klinge changing the locks at the pharmacy earlier in the day. Mr. Waller had a long-term business relationship with Klinge. (Doc. 50, Ex. 1 at 11, ¶ 2). Mr. Schmitt, manager of Klinge, had no specific authority to give new keys to any of the Plaintiffs, but gave them to Ms. Robinson, whom he believed was authorized to pick them up, as she was Waller's employee. (*Id*. at ¶¶ 8-10).

Plaintiffs then drove to Ideal and used the new keys to unlock the building. They began going through Mr. Waller's desk and other areas of the pharmacy, packing the contents of Mr. Waller's desk into garbage bags, and taking them to Mr. Waller's car. They were able to access Mr. Waller's car because Ms. Robinson had a set of keys. (Doc. 47 at 101, 114-19; Doc. 46 at 56-59). Mr. Waller's desk contained files, papers, check

books, writing utensils, and stationery. (Doc. 47 at 117). Plaintiffs were at the pharmacy for about an hour before Waller and Felton drove up unexpectedly at 5:00 p.m. (*Id*. at 119). Plaintiffs believed Waller would be at his doctor's appointment at 5:00 p.m., while they were at the pharmacy (Doc. 48 at 101-102); they did not know the appointment had been moved to 4:00 p.m. (Doc. 50, Ex. 1 at 16, ¶ 19).

When Waller and Felton arrived, Waller was angry and asked what the hell was going on, what they were doing there, and why the trunk of his car was open. (Doc. 47 at 120; Doc. 46 at 59; Doc. 48 at 111-13). Ms. Felton called the police to report a break-in at the pharmacy. (Doc. 47 at 120). Mr. Waller was yelling at Plaintiffs to put the bags of his property back in the pharmacy. (Doc. 48 at 146-48). Mr. Waller then asked Ms. Robinson to hand over all the keys she had to the pharmacy and his car. Ms. Givens explained that they were trying to help Ms. Robinson clean out the pharmacy and that Waller had given them permission to pick up the keys. Mr. Waller denied giving them permission to pick up the keys, and was still angry when the police arrived about ten minutes later. (*Id*. at 114-15).

Ms. Robinson told the police she had been cleaning out the pharmacy, per instructions from Mr. Wenker.[8] Ms. Givens tried to convince the police that her uncle did not know what he was talking about because he had dementia. (Doc. 48 at 128). Ms.

---

[8] Mr. Wenker testified that he did not instruct or suggest Plaintiffs go to the pharmacy for any reason. (Doc. 45 at 20). This conflict does not create an issue of material fact, as it is undisputed that Waller was upset that Plaintiffs were taking items out of the pharmacy.

Givens testified that the police would not give Mr. Waller his keys because he "had bizarre behavior" and was "demented." (*Id.* at 118-19). Mr. Waller was upset when the police gave his keys to his niece, so he called Mr. Schmitt to change the locks again the next day. (Doc. 50, Ex. 1 at 11, ¶¶ 14-18). To ensure the security of the building that evening, Mr. Schmitt broke off keys in all the locks until he could re-key them. (*Id.*)

The next day, October 31, 2008, Mr. Waller instructed Mr. Wenker to discharge Robinson, evict Green from the apartment he owned, and prohibit any further contact between Plaintiffs and Waller or his properties. (Doc. 45 at 23-34; Exs. I, M). Over the next several days, Waller, Wenker, and Chiaro went through the bags Plaintiffs had loaded at the pharmacy. They discovered prescription drugs, along with papers and items from his desk. (*Id.* at 72-74).

On November 14, 2008, Mr. Waller filed a petition for civil protection order against Robinson, Givens, and Green, supported by the following statement under oath:

> For the past several months, Respondent, acting alone and with the help of others, has followed me to my home, place of business and the home of my friend, Sharon Felton. She followed me in an effort to both control my movements and the people with whom I associate. Her actions have caused me to suffer serious mental and emotional distress and I am afraid she and/or her associates will also cause me physical harm.

(Doc. 45, Ex. Z).[9] The petitions were granted, and civil protection orders were issued

---

[9] This statement is taken from the petition against Tanya Green. Similar statements were filed in support of the petitions against Ms. Robinson and Ms. Givens. The primary difference is the additional statement in the Robinson petition that she had also been gathering information about Mr. Waller's bank accounts and other personal/business assets. (*Id.*, Ex. U).

against all three Plaintiffs from November 21 through December 5, 2008, when Plaintiffs agreed to stay away from Waller. (Doc. 47 at 145; Doc. 48 at 244). Ms. Green did not voluntarily leave the apartment and was evicted after Mr. Waller testified that he wanted Green out of the apartment at a February 2, 2009 hearing. (Doc. 50, Ex. 1 at 23).

In February 2009, Mr. Waller was evaluated by Suzanne Norman, a Clinical Geropsychologist, to determine his decisional capacity for medical issues upon the referral of Waller's neurologist, Dr. Sheri TenPas. (Doc. 45, Ex. A). Dr. Norman's diagnosis, contained in her report, is Dementia due to Alzheimer's Disease, mild to moderate stage. She recommended a guardianship be pursued and that Waller be relocated to an assisted living facility for individuals with memory impairment. (*Id*.) In April 2009, Mr. Waller was hospitalized for prostate surgery. (Doc. 50, Ex. 1, guardianship trans. at 89).

Upon release from the hospital, Mr. Waller was placed in the Alzheimer's unit of Hyde Park Care Center ("HPCC"). (Doc. 45 at 66-67; Doc. 50, Ex. 1 at 16, ¶ 20). At the time of Waller's admission to HPCC, the social worker recommended that no one who would agitate or upset Waller be permitted to visit him while he was adjusting to his surroundings. (*Id*. at 28-29). In response, Wenker, in his capacity as attorney-in-fact for Waller, prepared a list of persons allowed and not allowed to visit Waller. (*Id*.) Plaintiffs were included on the list of persons not allowed to visit Waller. (Doc. 45, Ex. T; Doc. 48, Ex. 7). At no time did they seek the intervention of the probate court to address Wenker's restrictions on their visitation. (Doc. 50, Ex. 1 at 16, ¶ 23).

On July 21, 2009, Mr. Wenker filed an application to be appointed guardian of Waller's person and estate. (Doc. 50, Ex. 1, guardianship docs). Eight days later, Givens filed a competing application. (*Id*.) Ms. Givens testified that if she were appointed guardian, she would take care of Waller herself, rather than having him in a facility, and she would charge him a rate of $38.00 per hour. (Doc. 48 at 196). Following a three-day hearing, Mr. Wenker was appointed guardian of Mr. Waller's estate, and a professional guardian, Wanda Bevington, was appointed guardian of Waller's person, effective March 10 and March 15, 2010, respectively. (Doc. 50, guardianship docs).

After Ms. Bevington was appointed guardian, she initially allowed Plaintiffs to visit Mr. Waller, but later restricted them from taking Mr. Waller out of the facility. (Doc. 48, Ex. 11). This change was due to Ms. Givens taking Mr. Waller to his rental properties and videotaping him talking to tenants about their rental issues; she also took Mr. Waller to his deceased mother's apartment and videotaped him watching other family members take property not already claimed by Waller. (*Id*.) Both incidents upset Waller, and Bevington determined it was in his best interest to stop those who would engage in such tactics from taking Waller out of the facility. (*Id*.) Ms. Givens testified that the purpose of the videotapes was to gather evidence for this lawsuit. (*Id*. at 176-88; Ex. 11). Ms. Bevington revised her instructions on November 10, 2010 to allow Robinson to take Mr. Waller out of HPCC and on November 17, 2010 to allow Givens to take Waller out for Thanksgiving. (*Id*.) Decisions about where Mr. Waller lives and who can visit him have been made by Bevington, not Mr. Wenker, since March 2010. (Doc. 45 at 17).

# IV. ANALYSIS

## A. Race Discrimination (Counts I, II, V)

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 claims for race discrimination are analyzed under the same framework as claims brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*.

Plaintiffs can establish a claim of discrimination under Title VII "either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Because the Amended Complaint provides no direct evidence of racial discrimination, the claims will be analyzed under the *McDonnell Douglas* burden-shifting scheme. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) ("Absent direct evidence of discrimination, claims brought pursuant to Title VII's antidiscrimination provision, Section 1981, and the Elliot-Larsen Act are subject to the tripartite burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

### 1. Givens' and Green's right to associate and make and enforce contracts

Plaintiffs Givens' and Green's claim focuses on their right to associate with their uncle. Plaintiffs maintain that Mr. Wenker tried to keep them away from their uncle due to their race and in retaliation for seeking to protect him from the alleged misappropriation of his assets.[10]

The "security of persons and property" language in Section 1981 limits the class of cases that may be brought under the equal benefit provision. *Chapman v. Hibgee Co.*, 319 F.3d 825, 833 (6th Cir. 2003). Freedom of association, while protected by the First Amendment from governmental interferences, is not one of the enumerated claims for which a private individual can be held liable. *Westray v. Porthole, Inc.*, 586 F. Supp. 834, 836 (D. Md. 1984) ("A plaintiff who alleges interference with his 'rights of association,' but not with one of the rights listed in the statute does not state a claim for relief under 42 U.S.C. § 1981."). Therefore, Plaintiffs' allegations that Defendants violated their "rights of association" fail.

---

[10] Additionally, Plaintiffs allege that Mr. Wenker attempted to deprive Mr. Waller and his heirs of property in violation of Section 1981. (Doc. 32 at ¶ 16). However, both Givens and Green deny any expectation of an inheritance from their uncle. (Doc. 48 at 59-60; Doc. 46 at 129-30). Ms. Givens also argues that she was deprived of the right to contract for the care of her uncle. (Doc. 53 at 16). Guardianship of an incompetent person in Ohio is determined by the probate court. Ohio Rev. Code § 2111.02. Ms. Givens applied to be the guardian of Mr. Waller in 2009, but the probate court denied her request. The decision to appoint Wanda Bevington as guardian of Mr. Waller's person was not made by Defendants -- it was made by the probate court. (Doc. 50, Ex. 1 - guardianship docs).

Even if Plaintiffs' allegations fit within the type of claim intended by Section 1981, to prevail, a litigant must prove intentional race discrimination, which involves a high threshold of proof. *Chapman*, 319 F.3d at 833. In support of their allegations that racial bias motivated Mr. Wenker to restrict their visits with Mr. Waller, Plaintiffs have offered nothing more than unfounded accusations. (Doc. 48 at 245; Doc. 46 at 72-73). For example, when asked about her claim of racial bias, Ms. Givens acknowledged that she knows nothing about Mr. Wenker's personal life, law practice, friends, and associates. She just has "never seen a white man so interested in a black man." (Doc. 43 at 133-34). Ms. Givens' personal view of Mr. Wenker's motives is not evidence of discrimination.[11]

## 2. *Elizabeth Robinson's discharge*

Next, Plaintiff Robinson alleges that Defendants violated Section 1981 by terminating her employment. Ms. Robinson was employed by Mr. Waller, through Lin-Gil Enterprises, from 1990 until she was terminated on October 31, 2008. Ms. Robinson worked in Mr. Waller's pharmacy as a receptionist. Defendants did not employ Ms. Robinson or control her access to employment. *LeMasters v. Christ Hosp.*, 777 F. Supp. 1378 (S.D. Ohio 1991). Accordingly, Plaintiff's claim fails.

---

[11] Conclusory, unsupported statements are insufficient to avoid summary judgment; a party will be successful in opposing a motion under Rule 56 only when it presents "definite, competent evidence to rebut the motion." *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

If Defendants had the power to terminate Ms. Robinson's employment, which they did not, in order to prove a *prima facie* case of discrimination Plaintiff would have to evidence that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). The first three elements are not disputed; however, Plaintiff cannot meet the fourth element. Moreover, Defendants have articulated a legitimate, non-discriminatory reason for her discharge, which she has failed to rebut.

Plaintiff relies on the theory that she was replaced by a white male, John Vujcec. Mr. Vujcec's duties as property manager for Mr. Waller's 18 residential and commercial properties include: finding, interviewing, and screening tenants, collecting rent, and improving the properties, either directly or through contractors he hires. (Doc. 50, Ex. 1 at 16, ¶¶ 14, 15; *Id.* at 13, ¶ 7). Mr. Vujcec never performed any duties related to the pharmacy. (*Id.*) Ms. Robinson testified that she occasionally accompanied Mr. Waller to his properties, took notes, and called contractors when Waller could not be reached, but admitted that she did not collect rent or negotiate leases. (Doc. 47 at 45). Moreover, she did not make decisions about repairs or improvements to the properties and anything she did outside her duties as receptionist was pursuant to direct instruction from Mr. Waller, who managed the properties himself until Mr. Vujcec was hired in April 2009. (*Id.* at 27-

28; 42-43).  Primary contractors who worked for Mr. Waller confirmed that they had no

interaction with Robinson outside the pharmacy.  (Doc. 50, Ex. 1 at 7, ¶¶ 4-8; *Id.* at 11,

¶¶ 3-4, 6-7).  Long-term tenants confirmed that they did not call or receive assistance

from Robinson, they worked with either Waller or Vujcec.  (*Id.* at 5, ¶¶ 3-10; *Id.* at 9,

¶¶ 4-7, 9-10).  Accordingly, Ms. Robinson was not replaced by Mr. Vujcec.

Even if Ms. Robinson could establish a *prima facie* case of discrimination, the

decision to terminate her was made by Mr. Waller, not by Defendants.  Mr. Waller

terminated Plaintiff because of her participation in the October 30 incident, and Ms.

Robinson admits she was terminated the day after that event.[12]  (Doc. 45 at 23-25).

In sum, Plaintiff's theory fails on several bases: (1) the Ideal Pharmacy was being

closed as of October 30, 2008 (Doc. 48 at 103); (2) John Vujcec was retained as property

manager for Waller's rental property six months after Ideal closed; and (3) Ms.

Robinson's duties were not the same as Vujcec's.[13]  Viewing the evidence in the light

most favorable to Ms. Robinson, the Court concludes that she did not perform the same or

similar duties as were being performed by Mr. Vujec and therefore cannot maintain a

---

[12] It is undisputed that Mr. Waller was angry about Plaintiffs' actions on October 30, 2008, when he discovered them at the Ideal Medical Building taking bags of his property out of the pharmacy.  (Doc. 48 at 101-102, 111-13; Doc. 47 at 120; Doc. 46 at 59).  Mr. Waller was still angry the next day when he made the decision to terminate Ms. Robinson.  (Doc. 45 at 23-24).

[13] "A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties."  *Love v. Elec. Power Bd. of Chatanooga*, 392 Fed. Appx. 405 (6th Cir. 2010).  An employee is "replaced" when another employee is hired or reassigned to perform the plaintiff's duties.  *Barnes v. Gen Corp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).

*prima facie* case or race discrimination.[14]

Accordingly, Plaintiffs' claims of race discrimination fail as a matter of law.

## B.      Housing Discrimination (Count III)

The Fair Housing Act ("FHA") prohibits all practices which make housing unavailable to persons because of, *inter alia*, race.  52 U.S.C. § 3604.  In order to succeed on her FHA claim, Plaintiff need not show that race was the sole factor in defendant's decision to terminate the tenancy; she need only establish that race was one motivating factor in the decision.  *Green v. Century 21*, 740 F.2d 482, 485 (7th Cir. 1975).

Ms. Green claims that she was evicted from her apartment by Mr. Wenker due to her race and/or in retaliation for her stand against Mr. Wenker's conduct toward her uncle.  (Doc. 32 at ¶ 36).

Plaintiff has asserted no legal theory by which an attorney representing a client in an eviction proceeding can be subjected to civil liability for discrimination under the FHA.  "A lawyer, like other agents, is not as such liable for acts of a client that make the client liable."  Restatement (Third) of the Law Governing Lawyers, Section 56 cmt. c (2000).   Even if Ms. Green were bringing a lawsuit against Mr. Waller as the decision maker, and even if she could meet the elements of her *prima facie* case, her claim would still fail because: (1) Mr. Waller had a legitimate, non-discriminatory reason to evict her; and (2) no evidence of racial animus is present.

---

[14]  Whether a terminated employee can show she was "replaced" will be determined as a matter of law if the facts in the record are not in dispute.  *See, e.g., Love*, 392 Fed. Appx. 405.

Additionally, the decision to evict Ms. Green was made by Waller, not Wenker. Mr. Wenker testified that he sent the notice to vacate and that his firm handled the eviction per Mr. Waller's instructions. (Doc. 45 at 23-25). There is no evidence that supports Ms. Green's speculation that Mr. Wenker made the decision to evict her.[15] As the owner of the apartment, Mr. Waller had the discretion to end a month-to-month tenancy for any reason with 30 days written notice. Ohio Rev. Code § 5321.17(B). Moreover, the record evidence indicates that nearly all of the tenants in Mr. Waller's rental properties are black, and Ms. Green was replaced by a black tenant. (Doc. 50, Ex. 1 at 13, ¶¶ 8, 9).

Therefore, Plaintiff's claim for racial discrimination pursuant to the FHA fails as a matter of law.

## C.    Attorney Malpractice (Count IV)

In order to prove legal malpractice, a plaintiff must show: (1) the existence of an attorney-client relationship; (2) breach of the attorney's duty to competently represent the client;[16] and (3) damages proximately caused by the breach. *Vahilia v. Hall*, 674 N.E.2d 1164, 1169 (Ohio 1997).

---

[15]  The evidence indicates that Mr. Waller was very angry when he found Plaintiffs at Ideal on October 30, 2008, asking "what the hell is going on; what are you doing here;" and telling them to put the bags back in his pharmacy. (Doc. 47 at 120; Doc. 46 at 59; Doc. 48 at 111-13, 146-48).

[16]  Breach of duty must be proven by expert testimony, unless the breach is so obvious that the court can decide as a matter of law or it is within ordinary knowledge and experience of lay people. *Georgeoff v. O'Brien*, 663 N.E.2d 1348, 1351 (1995).

An attorney is not liable to third parties for services rendered on behalf of a client, in good faith, unless the third party is in privity with the client of the attorney or the attorney acts with malice. *Scholler v. Scholler*, 462 N.E.2d 158 (Ohio 1984). Plaintiffs malpractice claim stems from Wenker's 35-year attorney-client relationship with Waller. Plaintiffs had no attorney-client relationship with Mr. Wenker. (Doc. 50., Ex. 1 at 16, ¶¶ 2-4, 8; Doc. 28 at 218, 246; Doc., 47 at 148). Accordingly, Plaintiffs have no standing to bring a malpractice claim against Defendants unless they evidence that Wenker acted with malice. *Sprouse v. Eisenman*, No. 04AP-416, 2005 Ohio App. LEXIS 487, at *8-9 (Ohio Ct. App. Feb. 8, 2005).

Malice in this context includes actions by the attorney demonstrating an ulterior motive, separate and apart from the good-faith representation of the client's interests, or conduct that implies "[a] condition of mind which prompts a person to do a wrongful act willfully, that is, on purpose, to the injury of another without justification or excuse." *Sprouse*, 2005 Ohio App. LEXIS 487 at 10. Plaintiffs' malpractice claims survived a motion to dismiss based on one reference to malicious conduct. However, now that the record is complete, Plaintiffs' evidence amounts to the following: (1) an admittedly unfounded suspicion that moving Waller's properties to an LLC meant Wenker was stealing; (2) that Wenker asked Waller to sign documents when he should have known Waller had dementia; (3) that others believed Wenker was cheating Waller; (4) that it took Wenker more than two weeks to respond to Gary Franke's request for documents; and (5) that Wenker got Robinson out of the way so he could put "all his little white

people in place that could help him and go along with him." (Doc. 47 at 146-55; Doc. 47 at 101-06). Plaintiffs fail to present any evidence to support these allegations.

For example, Plaintiffs assert that the 2009 Power of Attorney ("POA") signed on February 10, 2009 is evidence of Mr. Wenker's "unlawful scheme," because Mr. Waller was evaluated eight days later to confirm a diagnosis of Alzheimer's. (Doc. 32 at ¶ 17(H)). This argument is without merit for three reasons: (1) Dr. Norman, who was not retained by Wenker, issued her diagnosis on March 2, 2009, which began a process that resulted in Waller being declared incompetent in October 2010; (2) Plaintiffs have not identified any detriment to Waller or benefit to Wenker associated with the 2009 POA, which simply changed the alternative attorney-in-fact (with Wenker as primary POA, as he had been since 1988);[17] and (3) Wenker testified that he believed Waller was competent at the time he signed the POA.[18] (Doc. 45 at 9-10). There are no facts in the record establishing improper conduct or malice.

Moreover, it is axiomatic that "[s]ummary judgment in favor of the attorney is appropriate when a plaintiff fails to supply expert testimony on alleged negligence that is 'neither within the ordinary knowledge of the layman nor so clear as to constitute

---

[17] In fact, the attorney Plaintiffs hired to look for problems with Wenker's representation found none. (Doc. 50, Ex. 1 at 3, ¶¶ 2-6).

[18] An attorney's mistake regarding competency is not evidence of malice. *Cunningham v. Cunningham*, No. 08AP-1049, 2009 Ohio App. LEXIS 3935 (Ohio Ct. App. Sept. 8, 2009) (even if the mother was incompetent when she signed her will, such evidence would not demonstrate that the attorney acted with malice, as a mistake regarding competency at the time the will was signed suggests negligence, not an ulterior motive or malice).

negligence as a matter of law.'" *Welch v. Ziccarelli*, No. 2006-L-229, 2007 Ohio App. LEXIS 3947, at *P47 (Ohio Ct. App. Aug. 24, 2007). This Court's pretrial order mandated that Plaintiffs identify expert witnesses and produce reports by July 15, 2011. (Doc. 31). Plaintiffs did neither.[19] Moreover, Defendants' motion for summary judgment is supported by Mr. Wenker's affidavit, which states that all of his work for Mr. Waller was performed within the standard of care required of an attorney with his education and experience. (Doc. 50, Ex. 1 at 16, ¶ 6). Ohio courts have recognized that "an affidavit from the acting attorney is a legally sufficient basis upon which to grant a motion for summary judgment in a legal malpractice action absent any opposing affidavit of a qualified expert witness for the plaintiff." *Yates v. Brown*, 185 Ohio App. 3d 742 (Ohio App. 2010).[20]

Therefore, in addition to the previously discussed barriers to establishing a legal malpractice claim, Plaintiffs have failed to produce evidence that Defendants breached

---

[19] Plaintiffs argue that they need not support their third-party malpractice claim with expert evidence because misuse of client funds is a breach of professional duty that is within the common understanding of laymen. (Doc. 53 at 18, citing *McInnis v. Hyatt Legal Clinics*, 10 Ohio St.3d 112 (1984)). Contrary to Plaintiffs representation, in *Hyatt*, the court determined that no expert was necessary where the claim was based on the attorney's failure to follow a client's instructions and has been distinguished repeatedly by Ohio courts, where the "claim of legal malpractice involves questions about an attorney's professional judgment." *Brown v. Morgenstern*, No. 2002-T-164, 2004 Ohio App. LEXIS 2571, at *21 (Ohio App. June 4, 2004). Additionally, Plaintiffs fail to point to any evidence that Mr. Wenker misused Mr. Waller's funds.

[20] Additionally, Plaintiffs fail to show that they were harmed in any way as a result of the alleged breach. No plaintiff has claimed privity with Mr. Waller, and both nieces denied any expectation of inheritance from him. (Doc. 48 at 59-60; Doc. 46 at 129-30).

the standard of care.  Accordingly, summary judgment is warranted as a matter of law.

**D.     Abuse of Process**

Under Ohio law, an abuse of process claim contains the following elements:

"(1) that a legal proceeding has been set in motion in proper form and with probable

cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior

purpose for which it was not designed;[21] and (3) that direct damage has resulted from the

wrongful use of process." *Yaklevich v. Kemp, Schaeffer & Rowe Co.*, 646 N.E.2d 115,

paragraph one of syllabus (Ohio 1994).  Simply stated, "abuse of process occurs where

someone attempts to achieve through use of the court that which the court is itself

powerless to order."  *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 662 N.E.2d 9, 14 (Ohio

1996).  Plaintiffs argue that the complaints seeking civil protection orders and the

eviction proceeding are both evidence of abuse of process.

In support of their argument that the protective orders were an abuse of process,

Plaintiffs argue that: (1) the complaints for protective orders were dismissed at the request

of the petitioner; and (2) that Defendants only wanted protection from Plaintiffs because

they were "cooperating in the investigation of alleged wrongful activity by Defendants."

(Doc. 53 at 18).

First, however, dismissal of a complaint is insufficient to prove the complaint was

without merit.  Complaints are dismissed for a variety of reasons, including the reason

---

[21]   "Under the second element, there is no liability [for abuse of process] where the
defendant has done nothing more than carry out the process to its authorized conclusion, even
though with bad intentions."  *Hahn v. Star Bank*, 190 F.3d 708, 718 (6th Cir. 1999).

here: that Plaintiffs agreed to voluntarily stay away from Mr. Waller after he signed a statement verifying that Plaintiffs had been following and harassing him and that he wanted them to stay away from him.  (Doc. 47 at 145; Doc. 48 at 244; Doc. 45, Ex. Z). Second, the purpose of a protection order is to keep the subject away from the person to be protected.  The protective orders in the instant case were filed for the very purpose that was accomplished – to keep Plaintiffs away from Waller.  Therefore, Plaintiffs fail to make a *prima facie* case.

With respect to Ms. Green's eviction, abuse of process does not apply because the process was used for the intended purpose – to remove a tenant based on Waller's desire to have her out.  Ms. Green's concern that her uncle was influenced by Wenker or that there was "no basis" for the process, does not support her claim.  The assertion that the eviction proceeding was an abuse of process because it was for the purpose of forcing Ms. Green to cease cooperating with Mr. Wenker's "investigation" is not supported by the evidence.  Mr. Wenker testified that he did not know the reason Waller met with another attorney to review the work he had done, but that he believed it was because Jim Williams (an acquaintance of Waller) and Elizabeth Robinson had been telling Waller "things that made him think that I was doing things not in his best interest" (Doc. 45 at 11).  Mr. Wenker did not mention Tanya Green or Sandra Givens.

Moreover, Mr. Waller, not Defendants, was the plaintiff in both the complaints for protection orders and the eviction action.  Plaintiffs' speculation that Mr. Waller would

never voluntarily agree to such actions leads to the unsupported allegation that Mr. Wenker either brought these actions against his client's wishes or forced him to sign the documents and coerced his testimony at the eviction hearing.

Accordingly, Plaintiffs fail to present any evidence or even allegations that rise to the level of the type of improper behavior sufficient to support a claim for abuse of process.

### V.    CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment (Doc. 50) is **GRANTED** and this case is **CLOSED**.

**IT IS SO ORDERED.**

Date:  May 14, 2012                          *s/ Timothy S. Black*
                                             Timothy S. Black
                                             United States District Judge